**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| JUAN MARTINEZ, on behalf of himself and all others similarly situated, | ) ) | |
| | ) | |
| Plaintiffs, | ) ) | Case No: 4:09CV3079 |
| | ) | |
| v. | ) ) | |
| CARGILL MEAT SOLUTIONS CORPORATION, | ) ) ) | |
| | ) | |
| Defendant. | ) ) | |
| | ) | |
| DALE HAFERLAND, JUAN MUNOZ, KARLA VELASQUEZ, and MANUE CORONA, on behalf of themselves and all other similarly situated individuals, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | Case No. 8:09CV00247 |
| | ) | |
| v. | ) ) | |
| CARGILL MEAT SOLUTIONS CORPORATION, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT CARGILL MEAT SOLUTIONS CORPORATION'S
BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.   INTRODUCTION

In this consolidated action, Plaintiffs assert claims against Cargill Meat Solutions Corporation ("CMSC") based on the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.;* the Nebraska Wage and Hour Act ("NWHA"), Neb. Rev. Stat. §§ 48-1201 to 1209; and the Nebraska Wage Payment and Collection Act ("NWPCA"), Neb. Rev. Stat. §§ 48-1228 to 1232. The parties have agreed to hold further discovery of individual class members and experts in

abeyance and to limit discovery to CMSC's defenses under the FLSA, in particular Section 3(o) and Section 259, and to the state law claims asserted, in order to avoid additional costs and expense. The parties further agreed to brief CMSC's motion for summary judgment on its FLSA Section 3(o), Section 259 and defenses related to the state law claims, all of which CMSC contends involve purely legal issues that are dispositive of Plaintiffs' claims.

Plaintiffs seek alleged unpaid wages for activities they perform before shift, after shift, and during the unpaid meal period at CMSC's beef-processing facility in Schuyler, Nebraska, where all members of the conditionally certified gang time class are represented by a union. However, even when viewed in a light most favorable to Plaintiffs, the undisputed facts demonstrate that CMSC is entitled to judgment as a matter of law on Plaintiffs' pre- and post-shift donning, doffing and walking time claims.[1]

As explained below, FLSA Section 3(o) bars Plaintiffs' FLSA claim to wages for pre-and post-shift donning and doffing and related activities. Specifically, Section 3(o) of the FLSA allows employers and unions to agree to exclude from hours worked time spent changing in to and out of "clothes" at the beginning and end of the workday. Five of the six federal Circuit Court of Appeals that have considered the issue – the Fourth, Fifth, Sixth, Seventh and Eleventh – have adopted a broad definition of the term "clothes" as it is used in Section 3(o), concluding that a wide range of protective clothing and equipment falls within the plain meaning of "clothes" under the statute, including, in some cases, the protective clothing and equipment worn

---

[1]    Although there is no dispute that CMSC pays Plaintiffs for meal period donning and doffing pursuant to a joint time study conducted by CMSC and the Union representing Plaintiffs, Plaintiffs dispute whether that time is sufficient and therefore CMSC is not moving for summary judgment on the meal period claims. Likewise, although CMSC contends that Plaintiffs' argument for compensation for time spent sanding steels has no merit given that such activities are performed on the clock or involve *de minimis* amounts of time, CMSC is not moving for summary judgment on those claims either.

by employees in the meat and poultry industry.[2]  CMSC urges this Court to reach the same conclusion and to thus grant summary judgment to CMSC on Plaintiffs' pre- and post-shift donning, doffing and walking time claims.

Moreover, at all times during the relevant period, CMSC has relied in good faith on published Opinion Letters from the U.S. Department of Labor with regard to its compensation practices at the Schuyler plant.  Therefore, FLSA Section 259 affords CMSC a complete defense to liability for Plaintiffs' pre- and post-shift donning, doffing and walking time claims.  Finally, the state law claims Plaintiffs allege are neither supported by the facts nor are they properly maintained under the principles of federal law preemption established by the U.S. Supreme Court.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1(a)(1) of the Local Rules for the District of Nebraska, for purposes of this Motion only, CMSC submits the following Statement of Undisputed Material Facts:

### Jurisdiction and Venue

1.      The parties do not dispute that this Court has jurisdiction and that venue is proper. (*See* Report of Parties' Rule 26 Planning Meeting (Docket Entry No. 17 at 1.)

### The Parties

2.      CMSC owns and operates a beef processing plant in Schuyler, Nebraska (the "Schuyler Plant").  (*Martinez* Compl. ¶ 1; *Haferland* Compl. ¶ 1.)

3.      Plaintiffs are current and former non-exempt production-line and support employees at the Schuyler Plant.  (*Martinez* Compl. ¶ 2; *Haferland* Compl. ¶¶ 1, 3.)

---

[2]      Only the Ninth Circuit has reached the opposite conclusion.  *See Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003), aff'd on other grounds, *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005).

4.     At all relevant times, production and maintenance employees at the Schuyler Plant have been represented by the United Food and Commercial Workers International Union Local No. 22 (the "Union"). (*Martinez* Compl. ¶ 3; Ex. A, Agreement Between CMSC and UFCW and its Local # 22, November 5, 2005 through November 14, 2010 (Bright Dep. Ex. 6) (the "2005 CBA").)[3]

5.     The Union is the sole and exclusive bargaining representative of Schuyler employees in a unit consisting of all production and maintenance employees. (Ex. A, 2005 CBA at Article 1.)

6.     The Union-represented bargaining unit at the Schuyler Plant includes all jobs in the FLSA class conditionally certified in this lawsuit, which consists of "[a]ll current and former non-exempt hourly employees who have been employed at any time by Defendant at its Schuyler, NE facility during the time period April 20, 2006 to the present, who were compensated on a gang time system and wore or used personal protective equipment." (*Id.*; Order dated December 11, 2009 at p. 14 (Dkt. 56).)

## Clothing and Safety Equipment Worn By Gang Time Employees at the Schuyler Plant

7.     In performing their respective jobs, gang time employees wear a variety of protective clothing and safety equipment, which is commonly referred to as Personal Protective Equipment ("PPE"). The terms PPE, safety clothing, and equipment are used interchangeably at

---

[3]     CMSC has attached the relevant excerpts of depositions and supporting materials from the record as part of CMSC's Index of Evidence in Support of Motion for Partial Summary Judgment, filed contemporaneously herewith.

the Schuyler Plant to describe many of the same items. (Ex. B, Thompson Dep.[4] 12:19-13:17; 14:13-15:1; Ex. C, Heller-Glen Dep.[5] 138:2-139:9.)

8.     The PPE worn by any particular employee depends on the work performed by the employee and differs among the various departments at the Schuyler Plant. (Ex. D, Heller-Glen Decl. ¶ 16.) The common items of PPE worn by many gang time employees at the Schuyler Plant include frocks, hair nets, ear plugs, hard hats, rubber or cotton gloves, and boots. (Ex. D, Heller-Glen Decl. ¶ 17; Ex. B, Thompson Dep. 53:22-54:6.)

9.     Employees are allowed to and do take home their hard hats, hairnets, ear plugs, safety glasses and boots. (Ex. E, Martinez Dep. 31:20-23; 51:10-52:2; 73:15-74:7; Ex. D, Heller-Glen Decl. ¶ 17; Ex. C, Heller-Glen Dep. 134:12-136:17; Ex. F, May 2009 Schuyler Employee Handbook at 003957 (Heller-Glen Dep. Ex. 5); Ex. B, Thompson Dep. 44:20-45:10.)

10.    Employees who work in positions requiring the use of a knife, such as Plaintiff Juan Martinez, also wear one or more of the following items of PPE: mesh apron, mesh sleeve, plastic arm guard, mesh glove, rubber glove, polar sleeve (aka Kevlar sleeve), Kevlar glove, chain belt, scabbard, or shin guards. (Ex. D, Heller-Glen Decl. ¶ 16; Ex. E, Martinez Dep. 24:23-30:15; Ex. G, Job Task Procedure for Trim Clods position (Martinez Dep. Ex. 1) (includes color photographs of the PPE identified by Plaintiff); *see also* Ex. H, Additional Job Task Procedures (Thompson Dep. Ex. 14) (includes color photographs of PPE).)

### Plaintiffs' Hourly Wages

11.    During the relevant time period, the base labor wage rates for gang-time employees under the 2005 CBA ranged from $11.50 to $12.70 per hour, and employees could

---

[4]     Steven Thompson is the Schuyler Plant's General Manager. (Ex. B, Thompson Dep. 4:19-20.)
[5]     Sarah Heller-Glen is the Schuyler Plant's Human Resources Manager. (Ex. C, Heller-Glen Dep. 21:22-25.)

make substantially more on a per hour basis due to their seniority or due to premium rates paid for certain work shifts. (Ex. A, 2005 CBA, at Article 6.) The base labor rate was $11.50 per hour until November 13, 2006; $11.80 per hour from November 13, 2006 to November 11, 2007; $12.10 per hour from November 12, 2007 to November 11, 2008; $12.40 per hour from November 13, 2008 to November 15, 2009; and $12.70 per hour from November 16, 2009 to the present. (*Id.*)

### Payment of Supplemental Minutes to Gang Time Employees

12.     Plaintiffs and putative class members are paid on a gang time basis, which is calculated for each worker pursuant to the collective bargaining agreement between the Union and CMSC. (Ex. A, 2005 CBA at Article 5.02.)

13.     Gang time is the amount of time that elapses between the arrival of the first piece of meat and last piece of meat at a designated point on the production line. The designated points are set by the 2005 CBA and the gang time for each shift is recorded by a CMSC management person and verified by a Union member at the Schuyler Plant. (Ex. C, Heller-Glen Dep. 49:7-52:12; 63:12-66:2.)

14.     The collective bargaining agreement between the Union and CMSC that was in effect throughout the relevant time period provides that employees are not paid for the time they spend changing clothes, including the donning and doffing of safety clothing and equipment worn in their jobs, and the time they spend washing up before and after paid production work. (Ex. A, 2005 CBA at Article 6.08.)

15.     However, employees are paid for time they spend donning and doffing PPE before and after their meal periods. (Ex. I, Bright Dep.[6] 146:24-147:12; Ex. C, Heller-Glen Dep. 58:10-17; 119:16-120:3.)

16.     Employees also are paid for the time they spend outside of paid production work cleaning their safety clothing and equipment (PPE), and for the time spent walking from their work area to the wash station, waiting, and washing their PPE pursuant to the collective bargaining agreement. (Ex. A, 2005 CBA at Article 6.08.)

17.     At all times during the relevant time period, CMSC paid gang time employees at the Schuyler Plant three, four, or five minutes per day in addition to gang time, depending on the department in which the employee worked and the specific PPE worn by the employee. (Ex. I, Bright Dep. 58:2-61:5; Ex. C, Heller-Glen Dep. 165:18-167:6; Ex. J, Heller-Glen Dep. Ex. 8.) These supplemental minutes were paid to compensate employees for donning, doffing, walking, waiting, washing and related activities that occurred during the unpaid meal period and at the end of the work shift. (*Id.*) The supplemental minutes were derived from a Joint Time Study conducted in May 2000 by the Union and CMSC. (Ex. I, Bright Dep. 60:23-61:5.)

18.     For purposes of this Motion only, CMSC accepts as true Plaintiff Juan Martinez's statement that he was not paid for approximately 62-78 minutes each day, which includes the activities excluded under Article 6.08 of the 2005 CBA, plus 15-20 minutes of sanding his knife sharpener each night, and 7-8 minutes once a month to get a new metal apron, metal gloves or boots. (Ex. K, Martinez Resp. to Interrogs. No. 10.)

19.     For purposes of this Motion only, CMSC accepts as true Plaintiff Antonio Guzman's allegation that, while working in a Fabrication department job, he was not paid for 50-

---

[6]     Gary Bright is CMSC's former Vice President of Labor Relations. (Ex. I, Bright Dep. 8:22-9:7.)

65 minutes each day, which includes the activities excluded under Article 6.08 of the 2005 CBA, plus 15-20 minutes of cleaning his knife sharpeners each night, 1-2 minutes each week to obtain replacement equipment, and 5 minutes each time CMSC determined that his equipment was not properly cleaned; that, while working in a Packing department job, he was not paid for 36-45 minutes each day, plus 1-2 minutes each week to obtain replacement equipment; and that, while working in a Kill department job, he was not paid for 27-36 minutes each day.  (Ex. L, Guzman Resp. to Interrogs. No. 10.)

### Pre-Shift Activities of Gang Time Employees

20.     Before December 2009, employees changed into their PPE either in a designated locker room or at their individual workstations.  (Ex. E, Martinez Dep. 35:20-36:16; 100:3-14; Ex. B, Thompson Dep. 43:3-47:1; 53:1-21; Ex. C, Heller-Glen Dep. 102:2-13.)

21.     As of approximately December 2009 in the Slaughter department and May 2010 in the Fabrication department, CMSC had implemented rules that employees could not store their PPE in their lockers.  (Ex. B, Thompson Dep. 46:9-47:1; 48:14-49:5; Ex. C, Heller-Glen Dep. 101:19-23.)

22.     Thus, since approximately December 2009 in the Slaughter department and May 2010 in the Fabrication department, employees have been changing into their PPE, other than those items they are allowed to take home, at their individual workstations.  Employees also no longer wash their PPE; CMSC performs these actions.  (Ex. B, Thompson Dep. 74:15-75:11; Ex. C, Heller-Glen Dep. 146:9-11.)

### Meal-Period Activities of Gang Time Employees

23.     Throughout the statutory period, gang time employees received a 30-minute unpaid meal period every day they worked more than 5 hours.  (Ex. A, 2005 CBA at Article 9.02; Ex. E, Martinez Dep. 109:22-110:14.)

24.     At the beginning of the meal period, employees typically only remove a portion of their PPE, specifically their frock or apron, gloves, and mesh safety equipment, which they hang on hooks near the production floor.  After the end of the meal period, employees put back on the PPE they removed.  (Ex. E, Martinez Dep. 75:14-20; 111:13-116:19; Ex. B, Thompson Dep. 122:19-124:3.)

25.     Throughout the statutory period, gang time employees have been paid for doffing and re-donning their PPE before and after the meal period in an amount agreed to by the Union and CMSC pursuant to the May, 2000 Joint Time Study.  (Ex. I, Bright Dep. 146:24-147:12; Ex. C, Heller-Glen Dep. 58:10-17; 119:16-120:3; Ex. M, Joint Time Study (Bright Dep. Ex. 2).)

### Post-Shift Activities of Gang Time Employees

26.     Before December, 2009, at the end of their shift, employees took off their PPE at their individual workstations or in the locker room.  (Ex. E, Martinez Dep. 134:8-136:16; 159:4-160:18; Ex. C, Heller-Glen Dep. 102:2-13.)

27.     As of December, 2009 in the Slaughter department and May 2010 in the Fabrication department, at the end of their scheduled shift, employees take off their PPE at their individual workstations.  (Ex. B, Thompson Dep. 46:9-19; 48:20-49:5; Ex. C, Heller-Glen Dep. 101:19-23.)

28.     At the end of shift, employees are paid for walking from their workstation to the wash station, waiting at the wash station, and washing PPE.  (Ex. A, 2005 CBA at Article 6.08; Ex. I, Bright Dep. 58:2-61:5; Ex. C, Heller-Glen Dep. 165:18-167:6; Ex. M, Joint Time Study (Bright Dep. Ex. 2).)

29.     However, as of approximately December 2009 in the Slaughter department and May 2010 in the Fabrication department, employees no longer walk from their work station to the wash station after their shift, no longer wait to wash their PPE, and do not wash their PPE.

Instead, those items are left at the individual's work station and are washed by CMSC. Nevertheless, employees still receive the supplemental pay intended to compensate for these activities. (Ex. C, Heller-Glen Dep. 58:15-17; 121:16-25; 146:9-11.)

**After Conducting a Joint Time Study with the Union, CMSC Agreed to Pay Supplemental Minutes to Gang Time Employees for Donning and Doffing and Related Activities**

30.     The supplemental minutes paid to employees at the Schuyler Plant were determined by agreement with the Union in May of 2000, when CMSC (then known as Excel Corporation) entered into an agreement with the Union modifying the collective bargaining agreement in effect at the time (the "2000 Agreement"). The 2000 Agreement defines "safety clothing and equipment" as including the following items:  mesh body suit, mesh apron, front mesh, back mesh, mesh gloves, mesh leggings, mesh sleeve, belly guard, shin guards, face guard, plastic arm guards, whizzard gloves, whizzard sleeves, rubber apron (when used with other listed items or required to be worn for safety reasons), scabbard for knives, hand guards, rubber, gloves worn over mesh, and other like safety clothing, equipment and gear. (Ex. N, 2000 Agreement (Bright Dep. Ex. 4).)

31.     In May, 2000, the Union and CMSC conducted a joint time study to determine the time spent by employees in putting on, taking off, and cleaning the safety clothing and equipment covered by the 2000 Agreement, as well as the walking time from the workstation to the wash station and waiting at the wash station. (Ex. I, Bright Dep. 51:9-53:16; Ex. N, 2000 Agreement at 1.)

32.     Pursuant to the 2000 Agreement, CMSC agreed to pay Union employees at the Schuyler Plant for time spent (a) donning of certain safety clothing and equipment and/or gear required to be worn by employees; (b) walking to the wash area to clean such safety clothing and equipment and/or gear, knives and hooks; (c) waiting at the wash area to clean such safety

clothing and equipment and/or gear, knives and hooks; (d) washing such safety clothing and equipment and/or gear, knives and hooks, and (e) doffing of such safety clothing and equipment and/or gear. (Ex. I, Bright Dep. 50:5-51:8; Ex. N, 2000 Agreement at 1.)

33.     As a result of the 2000 Agreement, Schuyler employees in the Kill department were paid either 6 or 8 minutes of supplemental pay, depending on the amount of PPE worn, and employees in the Fabrication department were paid either 4 or 6 minutes of supplemental pay, depending on the amount of PPE worn.  (Ex. N, 2000 Agreement at 2-3; Ex. I, Bright Dep. 54:9-20.)

**CMSC Participated In Industry Effort to Seek the Opinion
of the Department Of Labor Regarding the Applicability of FLSA Section 3(o)
to PPE Worn By Meatpacking Employees**

34.     In late 2001, The American Meat Institute ("AMI") requested an opinion letter from the DOL regarding the applicability of FLSA Section 3(o) to PPE worn by employees in the meatpacking industry.  Specifically, the AMI urged the DOL to reconsider the position it had taken in a prior opinion letter that PPE worn in the meat-packing industry was not "clothing" for purposes of Section 3(o).  (Ex. I, Bright Dep. 78:21-79:3.)

35.     In November 2001, in connection with that request, CMSC attended a meeting with Cameron Findlay (then the Acting Administrator of the DOL's Wage and Hour Division) and representatives of AMI called to discuss FLSA Section 3(o)'s application to donning and doffing protective equipment, including mesh equipment, by meatpacking employees.  (Ex. I, Bright Dep. 73:14-75:10; 77:14-79:3; 101:14-102:25.)

36.     At the meeting with the DOL, CMSC and the AMI representatives specifically requested that the DOL reconsider the position it had taken in a prior opinion letter that PPE worn in the meat-packing industry was not "clothing" for purposes of Section 3(o). (Ex. I, Bright Dep. 78:21-79:3; 102:5-25.)

37.    On June 6, 2002, the Administrator of the Wage and Hour Division of the U.S. Department of Labor ("DOL") issued an Opinion Letter ("2002 Opinion Letter"), in which she concluded that "the term 'clothes' as used in Section 3(o) of the Fair Labor Standards Act includes the "protective safety equipment typically worn by meat packing employees" and that the DOL interpreted "clothes" under Section 3(o) "to include items worn on the body for covering, protection or sanitation." (Ex. I, Bright Dep. 72:21-73:3; Ex. O, June 6, 2002 DOL Opinion Letter.)

### CMSC Relied on the 2002 Opinion Letter in Negotiations With the Union for the 2005 Collective Bargaining Agreement

38.    More than three years after the DOL issued the 2002 Opinion Letter, CMSC began negotiations with the Union at Schuyler for what became the November 2005 collective bargaining agreement ("2005 CBA"). (Ex. I, Bright Dep. 182:2-186:15.)

39.    Gary Bright was responsible for negotiating the collective bargaining agreement between CMSC and Schuyler employees represented by the Union. (Ex. I, Bright Dep. 42:18-20; 182:2-186:16.)

40.    Kurt Brandt was chief negotiator for the Union during the negotiations for the 2005 CBA. (Ex. I, Bright Dep. 153:10-11; 185:23-186:4.)

41.    In October, 2005, CMSC negotiated with the Union to exclude payment for pre-shift donning and post-shift doffing time from the Schuyler employees' pay, consistent with the pronouncement in the 2002 Opinion Letter. CMSC specifically referenced the 2002 Opinion Letter at the bargaining table when the Union and CMSC were negotiating the 2005 CBA. (Ex. I, Bright Dep. 141:21-25; 184:17–186:15; Ex. C, Heller-Glen Dep. 173:24-175:10; 179:1-180:3.)

42.    On October 26, 2005, the Union agreed to include language in the 2005 CBA stating that "the time employees spend changing clothes, including the donning and doffing of

safety clothing and equipment worn in their jobs, and the time they spend washing up before and after paid production work, shall be excluded from the employees' paid workdays. The parties agree, however, that employees who are required to wear safety clothing and equipment as defined in the agreement between [CMSC] and [the Union] shall be paid for an amount of time as determined by joint time studies beyond paid production work to compensate them for the time they spend outside of paid production work cleaning their safety clothing and equipment." (Ex. A, 2005 CBA at Article 6.08; Ex. I, Bright Dep. 186:5-15; Ex. C, Heller-Glen Dep. 179:9-180:3.) The 2005 CBA was submitted to the Union members for a vote and it was approved. (Ex. I, Bright Dep. 191:5-9.)

43.    Pursuant to the 2005 CBA, CMSC continued to pay employees for time spent doffing and re-donning of PPE before and after meal periods, as well as time spent by employees at the end of their shift walking from the workstation to the wash station, waiting to wash their PPE, and washing their PPE. (Ex. I, Bright Dep. 146:24-147:19; Ex. C, Heller-Glen Dep. 58:10-17; 119:16-120:3.)

44.    In January, 2006, the Union filed a grievance at the Schuyler Plant contesting CMSC's failure to pay for clothes changing time despite express language in the 2005 CBA, to which the Union had agreed, excluding from the employees' paid workdays the time employees spend changing clothes, including the donning and doffing of safety clothing and equipment worn in their jobs. CMSC denied the grievance. The Union thereafter agreed "to hold off, to shelf it, pending negotiations." (Ex. I, Bright Dep. 113:4-6; Ex. C, Heller-Glen Dep. 169:6-171:15; Ex. P, 2006 Grievance (Heller-Glen Dep. Ex. 10).)

### CMSC Sought Reaffirmation of the Department of Labor's 2002 Opinion Letter

45. After the 2005 CBA was ratified by the Union members at the Schuyler Plaint, CMSC on its own behalf requested an Opinion Letter from the DOL. (Ex. I, Bright Dep. 116:15-118:9.)

46. CMSC sought the DOL's opinion as to whether, notwithstanding the Ninth Circuit's decision in *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003) that PPE worn in the meatpacking industry was not "clothing" for purposes of Section 3(o), the DOL continued to maintain its definition of "clothes" to include safety clothing and equipment worn in the meatpacking industry as the DOL had expressed in the 2002 Opinion Letter and, whether outside the Ninth Circuit, CMSC could continue to rely on the 2002 Opinion Letter as the basis for a "good faith" defense under FLSA Section 259 against donning and doffing claims at locations where it had negotiated a collective bargaining agreement to exclude equipment donning and doffing time from compensable work time by the express terms of the collective bargaining agreement. (Ex. I, Bright Dep. 117:19-118:9; Ex. Q, April 14, 2006 Request for Opinion Letter.)

47. On March 6, 2006, CMSC communicated to its employees and the Union the change to the number of supplemental minutes paid to employees pursuant to the terms of the 2005 CBA. CMSC calculated the supplemental minutes to be paid after March 6, 2006 by deducting the pre- and post-shift donning and doffing times from the amounts determined by the Joint Time Study. (Ex. C, Heller-Glen Dep. 119:25-120:3; 161:20-165:17; 165:18-167:6; 189:16-21; Ex. J (Heller-Glen Dep. Ex. 8.)

48. As a result, after March 6, 2006, CMSC has paid employees three, four, or five minutes of daily supplemental pay, depending on their department and the equipment they wear, for time spent doffing and re-donning PPE before and after the meal period, as well as time spent

14

by employees at the end of their shift walking from the workstation to the wash station, waiting to wash their PPE, and washing their PPE. (Ex. C, Heller-Glen Dep. 119:25-120:3; 165:18-167:6; Ex. J (Heller-Glen Dep. Ex. 8.)

49. On May 14, 2007, in response to CMSC's request for an opinion letter, the Administrator of the DOL's Wage and Hour Division issued an Opinion Letter ("2007 Opinion Letter") in which the Administrator reaffirmed the 2002 Opinion Letter and again concluded that "changing clothes" for purposes of Section 3(o) includes the PPE worn by employees at meat packing plants, including the PPE worn by mesh-wearing employees at the Schuyler Plant, and affirmed that CMSC could continue to rely on the 2002 Opinion Letter everywhere outside the Ninth Circuit. (Ex. R, May 14, 2007 DOL Opinion Letter.)

50. In the 2007 Opinion Letter, the Administrator additionally concluded that since activities covered by Section 3(o) cannot be considered as principal activities and do not start the work day, walking time that occurs after a 3(o) activity is not compensable unless it is preceded by a principal activity. (Ex. R, May 14, 2007 DOL Opinion Letter.)

51. After CMSC received the 2007 Opinion Letter, and in reliance on the 2007 Opinion Letter, CMSC continued its practice under the 2005 CBA of excluding pay for pre-shift and post-shift clothes changing time and personal washing time, but continued paying employees for meal period doffing and donning and for post-shift walk, waiting and equipment cleaning time. (Ex. I, Bright Dep. 220:24-223:16.)

## III. ARGUMENT

### A. <u>Summary of Argument</u>

The undisputed facts demonstrate that CMSC is entitled to summary judgment on its defenses that (1) under FLSA Section 3(o) Plaintiffs cannot establish that gang time employees at Schuyler are entitled to compensation for time spent in pre- and post-shift donning and doffing

of their safety clothing and protective equipment because CMSC and the Plaintiffs' Union negotiated in good faith to exclude those activities from compensable time; (2) Plaintiffs cannot recover on their pre- and post-shift walk time claims because an activity that is excluded from compensable time pursuant to Section 3(o) cannot mark the beginning or end of the compensable workday; (3) throughout the relevant time period in this lawsuit CMSC has relied, in good faith, on DOL opinion letters to support the compensation practices in place at Schuyler and, therefore, FLSA Section 259 bars the Plaintiffs from recovery on their pre- and post-shift donning, doffing and walking time claims; and (4) the facts fail to support Plaintiffs' state law claims, which in any event are preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (a).

### B. Summary Judgment Standard

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 265 (1986). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a plaintiff may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must

substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda,* 517 F.3d at 531 (quoting *Bass,* 418 F.3d at 873). "If the evidence [offered by the nonmoving party] is merely colorable…or is not significantly probative…summary judgment may be granted." *Anderson,* 477 U.S. at 250.

### C.   Section 3(o) of the FLSA Requires That Judgment Be Entered In CMSC's Favor On Plaintiffs' Pre- and Post- Shift Donning, Doffing and Related Claims

The FLSA requires that employees be paid overtime compensation for "hours worked" in excess of 40 per week at a rate not less than one and one-half times the regular rate at which they are employed. 29 U.S.C. § 207(a)(1); *Mumbower v. Callicott,* 526 F.2d 1183, 1187 (8th Cir. 1975). However, in defining the meaning of "hours worked," Section 3(o) of the FLSA provides:

> *Hours Worked-* In determining for the purposes of section 206 and 207… the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee. 29 U.S.C. § 203(o).[7]

Under Section 3(o), time spent by employees in pre- and post-shift donning and doffing of "clothes" is excluded from the computation of hours worked if two conditions are met: first, the activities at issue must constitute "changing clothes" as that term is used in the statute, and, second, a bona fide collective bargaining agreement must exclude, by its express terms or by a

---

[7]   In this summary judgment proceeding, there is no issue about the compensability of "washing" time since the undisputed facts demonstrate that throughout the relevant time period CMSC has paid gang time employees for any time they spend waiting and washing their safety clothing and protective equipment at the end of their work shift. Moreover, CMSC and the Union conducted a Joint Time Study to determine the appropriate amount of time to pay for these activities. (SOF ¶¶ 30-32.) Furthermore, since at least May 2010, gang time employees at the Schuyler plant no longer wash their PPE at the end of the shift but are still paid for that time. (SOF ¶ 29.)

custom or practice under the agreement, time spent changing clothes and washing from compensable working time.

The legislative history of Section 3(o), as described by the Eleventh Circuit in *Anderson v. Cagle's, Inc.,* 488 F.3d 945 (11th Cir. 2007), reflects that passage of Section 3(o) was part of Congress' ongoing efforts to curtail judicially expansive interpretations of the FLSA. Representative Herter, the House sponsor of the bill that would become Section 3(o), explained that the purpose of the amendment to the FLSA was to "avoid another series of incidents which led to the portal-to-portal legislation." *Id.*, at 958 (quoting 95 Cong. Rec. 11,433 (Aug. 10, 1949)).    The statement of Rep. Herter (R. Mass.) on the House floor in support of the amendment that became Section 3(o) illustrates this concern:

> Mr. Chairman, this amendment is an amendment to the definitions under the act. It is offered for the purpose of avoiding another series of incidents which led to the portal-to-portal legislation and led to the overtime-on-overtime legislation. At the present moment there is a twilight zone in the determinations of what constitutes hours of work which have been spelled out in many collective-bargaining agreements but have not necessarily been defined in the same ways.
>
> Let me be specific. In the bakery industry, for instance, which is 75 percent organized, there are collective-bargaining agreements with various unions in different sections of the country which define exactly what is to constitute a working day and what is not to constitute a working day. In some of those collective-bargaining agreements the time taken to change clothes and to take off clothes at the end of the day is considered a part of the working day. In other collective-bargaining agreements it is not so considered. But, in either case the matter has been carefully threshed out between the employer and the employee and apparently both are completely satisfied with respect to their bargaining agreements.
>
> The difficulty, however, is that suddenly some representative of the Department of Labor may step into one of those industries and say, "You have reached a collective-bargaining agreement which we do not approve. Hence the employer must pay for back years the time which everybody had considered was excluded as a part of the working day."

> That situation may arise at any moment. This amendment is offered merely to prevent such a situation arising and to give sanctity once again to the collective-bargaining agreements as being a determining factor in finally adjudicating that type of arrangement. It sounds wordy, but in effect it is a very simple amendment.

95 Cong. Rec. H 112 10 (statement of Rep. Herter) (daily ed. Aug. 10, 1949). The Fourth, Fifth and Sixth Circuits have joined the Eleventh Circuit by citing Section 3(o)'s legislative history to support their holdings that the purpose of this statutory provision is to leave the issue of payment for time spent "changing clothes and washing" to the collective bargaining process. *Sepulveda v. Allen Family Foods, Inc.,* 591 F.3d 209, 217-18 (4th Cir. 2009), *cert. denied,* No. 09-1529, 2010 WL 2420333 (Oct. 4, 2010); *Allen v. McWane, Inc.* 593 F.3d 449, 458-59 (5th Cir. 2010); *Franklin v. Kellogg Co.*, No. 09-5880, 2010 WL 3396843, at *8 (6th Cir. Aug 31, 2010).

Congress, the courts and the legislative history are all in agreement that Section 3(o) is a definitional provision that should be construed broadly to preserve and uphold the integrity of the collective bargaining relationship. Indeed, as the overwhelming majority of courts have held, Plaintiffs have the burden of proof on both of elements of Section 3(o). *See Allen,* 593 F.3d at 458-59; *Franklin*, 2010 WL 3396843, at *4; *Cagle's,* 488 F.3d at 957; *Adams v. United States,* 471 F.3d 1321, 1325-26 (Fed. Cir. 2006); *Turner v. City of Philadelphia,* 262 F.3d 222, 226 (3d Cir. 2001); *Salazar v. Butterball, LLC,* No. 08-CV-02071, 2010 WL 965353, at *3 (D. Colo. Mar. 15, 2010); *McDonald v. Kellogg Co.,* No. 08-cv-2473, 2010 WL 3724649 (D. Kan. Sept. 16, 2010).

### 1. *The Plain Meaning of the Words "Clothes" and "Changing Clothes" in Section 3(o) Supports the Conclusion that the Safety Clothing and Equipment Worn by CMSC's Employees Fall Within that Definition*

It is well-settled that in examining the meaning of a statute, the court's inquiry begins with the statute's plain language. *United States v. Stanko,* 491 F.3d 408, 413 (8th Cir. 2007). "As in all such cases, [the court] begin[s] by analyzing the statutory language, 'assum[ing] that the

ordinary meaning of that language accurately expresses the legislative purpose.'" *United States v. I.L., Juvenile Offender,* 614 F.3d 817, 820 (8th Cir. 2010) (quoting *Hardt v. Reliance Standard Life Ins. Co.,* 130 S. Ct. 2149, 2156 (2010) (quoting *Gross v. FBL Fin. Servs., Inc.,* 129 S. Ct. 2343, 2350 (2009))).

The Fourth, Fifth, Sixth, Seventh and Eleventh Circuits all have concluded that the plain meaning of "clothes" in Section 3(o) includes safety gear and protective equipment. *Sepulveda,* 591 F.3d at 215; *Bejil v. Ethicon, Inc.,* 269 F.3d 477, 480 n.3 (5th Cir. 2001); *Franklin,* 2010 WL 3396843, at \*7; *Cagle's,* 488 F.3d at 956. The Seventh Circuit also recently agreed with the reasoning of the Fourth Circuit in *Sepulveda* in summarily concluding that the safety gear worn by employees at an Oscar Mayer meat processing plant falls within Section 3(o)'s definition of "clothes." *Spoerle v. Kraft Foods Global, Inc.,* 614 F.3d 427, 428 (7th Cir. 2010). At least three district courts in the Eighth Circuit have also adopted the same broad interpretation of "clothes" to include protective clothing and equipment. *Hudson v. Butterball, LLC,* No. 08-5071-CV, 2009 WL 3486780, at \*2 (W.D. Mo. Oct. 14, 2009); *Musticchi v. City of Little Rock, Arkansas,* No.4:08CV00419, 2010 WL 3327998, at \*5 (E.D. Ark. Aug. 24, 2010); *Saunders v. John Morrell & Co.,* No. C88-4143, 1991 WL 529542 (N.D. Iowa Dec. 24, 1991).

Webster's Third New International Dictionary, 428 (unabridged) (1986), defines "clothes" as "clothing," which in turn is defined as "covering for the human body of garments in general: all the garments and accessories worn by a person at one time." Quoted with approval in *Franklin,* 2010 WL 3396843, at \*7; *Sepulveda,* 591 F.3d at 214-15; *Cagle's,* 488 F.3d at 955. Not only is this definition expansive, it clearly applies to the PPE worn by employees in the meatpacking industry since Section 3(o) by its terms refers to clothes worn during the "workday." *Franklin,* 2010 WL 3396843, at \*7.

**2. The Undisputed Facts Demonstrate that Both Standard and Unique Safety Clothing and Protective Equipment Worn by Schuyler Gang Time Employees are "Clothes" Within the Meaning of Section 3(o)**

The undisputed facts demonstrate that gang time employees at Schuyler wear various items of safety clothing and protective equipment in performing their job duties, including standard items consisting of a frock, steel-toe boots, safety glasses, ear plugs, hair and/or beard net, and various items of unique equipment and gear depending on the job performed. (SOF ¶ 8.) Employees who use knives or other cutting instruments in performing their jobs wear one or more of the following additional items: mesh apron, mesh sleeve, plastic arm guard, mesh glove, rubber glove, polar/Kevlar sleeve, polar/Kevlar glove, chain belt, knife scabbard, or shin guards. (SOF ¶ 10.) All of these articles of safety clothing and protective equipment clearly qualify as "clothes" under Section 3(o).

Specifically, federal circuit courts have overwhelmingly accepted the premise that according to its ordinary meaning, "clothes" includes pants, shirts, smocks, and boots even if worn for safety or sanitary reasons. Accordingly, the non-unique items CMSC's employees don and doff – boots, hair nets, ear plugs, smocks, safety glasses, gloves and bump caps – are clothes for purposes of Section 3(o). *See Sepulveda,* 591 F.3d at 211-12 (holding that smocks, aprons, gloves, arm shields, steel-toe shoes, hard hats, safety glasses, earplugs, and hair nets are "clothes"); *Cagle's,* 488 F.3d at 956 (smocks, hair/beard nets, gloves, and hearing protection are clothes as that term is used in Section 3(o)); *Bejil,* 269 F.3d at 480 (lab coats, hair covers, facial hair covers and shoe covers or dedicated shoes kept in an assigned locker room and worn only in the facility are clothes). Moreover, virtually *all* district courts that have addressed the issue have similarly held that standard PPE qualifies as "clothes" within the meaning of Section 3(o) and that the donning and doffing of these items amounts to "changing

clothes" as that term is used in Section 3(o).[8]

While hard hats, safety glasses, earplugs, hair and beard nets should also be found to be "clothes" within the meaning of Section 3(o), at a minimum such items easily qualify as "accessories" mentioned in the definition of "clothes" adopted by the Fourth, Sixth and Eleventh Circuits in *Sepulveda, Franklin, and Cagle's. See also Musticchi,* 2010 WL 3327998 (holding that a gun holster, gun, ammunition, ammunition holders, clips or magazines, hand cuffs, hand cuff case, tear gas canister, baton ring, radio, and a radio case qualified as "clothes" under Section 3(o) because they were "accessories" to police officer uniforms); *Arnold v. Schreiber Foods, Inc.,* 690 F. Supp. 2d 672, 678 (M.D. Tenn. 2010) (holding that the definition of "clothes" includes accessories such as hard hats and hairnets).

---

[8]  *See Hosler v. Smithfield Packing Company,* No. 7:07CV166-H, 2010 U.S. Dist. LEXIS 101915 (E.D.N.C. Sept. 27, 2010) (adopting magistrate's recommendation that the full range of protective equipment, including mesh, worn by employees at hog processing facility were "clothes" within the meaning of Section 3(o)); *Arnold v. Schreiber Foods, Inc.,* 690 F. Supp. 2d 672, 677 (M.D. Tenn. 2010) (labeling plaintiffs' argument that shirts, pants and boots worn by employees for sanitary purposes were not "clothes" within the meaning of Section 3(o) as "counter to both common sense and the weight of precedent."); *Andrako v. U.S. Steel Corp.,* 632 F. Supp. 2d 398, 402 (W.D. Pa. 2009) (holding that flame retardant jackets and pants, boots, gloves,  hoods, hard hats, safety glasses, and hearing protection fit Section 3(o)'s definition "clothes"); *Johnson v. Koch Foods, Inc.,* 670 F. Supp. 2d 657, 660, 667 (E.D. Tenn. 2009) (same for smocks,  boots, hard hats, earplugs, hair and beard nets); *Sandifer v. U.S. Steel Corp.,* No. 2:07-CV-433, 2009 WL 3430222, at *6 (N.D. Ind. Oct. 15, 2009) (same for jackets, pants, hoods and boots); *Hudson,* 2009 WL 3486780, at *1 n.2, 7 (same for smocks, aprons, coveralls, boots, gloves, hard hats, safety glasses, earplugs, and hair nets); *Sisk v. Sara Lee Corp.,* 590 F. Supp. 2d 1001-02, 1009 (W.D. Tenn. 2009) (same for frocks, coats, steel-toe boots, and gloves), declined to follow for other reasons by *Franklin v. Kellogg Co.,* No. 09-5880, 2010 WL 3396843 (6th Cir. Aug. 31, 2010); *Gatewood v. Koch Foods of Mississippi, LLC,* 569 F. Supp. 2d 687, 689-90, 700 n. 24 (S.D. Miss. 2008) (same for smocks, eye protection, earplugs, hair and beard nets); *Figas v. Horsehead Corp.,* No. Civ. A. 06-1344, 2008 WL 4170043, at * 1, 12 (W.D. Pa. Sept. 3, 2008) (same for flame retardant jackets and pants, work shoes, and hard hats); *Kassa v. Kerry, Inc.,* 487 F. Supp. 2d 1063, 1066-67 (D. Minn. 2007) (holding that "clothes" under Section 3(o) includes pants, shirts, smock, boots and safety glasses); *Davis v. Charoen Pokphand (USA), Inc.,* 302 F. Supp. 2d 1314, 1319, 1321 (M.D. Ala. 2004) (same for smocks, aprons, gloves, boots, earplugs, and hairnets); *Saunders v. John Morrell & Co.,* No. C88-4143, 1991 WL 529542 at *1, 3-4 (N.D. Iowa Dec. 24,1991) (same for aprons, gloves, helmets, boots and goggles).

Likewise, the unique items of safety clothing and protective equipment worn by Plaintiffs at Schuyler also qualify as clothes for purposes of Section 3(o).[9]  Consistent with the overwhelming weight of legal authority, this Court should also embrace the expansive definition of "clothes" and find that the safety clothing and protective equipment worn by Schuyler employees meets Section 3(o)'s definition of "clothes" and that the donning and doffing of these items qualifies as "changing clothes" within the commonly accepted meaning of that provision.

Although Plaintiffs undoubtedly will urge this Court to follow Chief Judge Bataillon's holding in *Morales v. Farmland Foods,* No. 8:08CV504, slip op. (D. Neb. Aug. 16, 2010), that narrowly interprets the meaning of "clothes" in Section 3(o), the Court should decline to do so for several reasons.  With all due respect to Chief Judge Bataillon, his ruling in the *Farmland* case is not controlling in this case.  "[I]t is clear that there is no such thing as 'the law of the

---

[9]      *See Salazar v. Butterball, LLC,* No. 08-CV-02071, 2009 WL 6048979 (D.C. Colo. Dec. 3, 2009) (holding that arm guards, plastic sleeves, mesh gloves, and liner gloves plainly fell with Section 3(o)'s definition of "clothes"); *Johnson v. Koch Foods, Inc.,* 670 F. Supp. 2d 657 (E.D. Tenn. 2009) (holding that Kevlar and mesh gloves, arm guards, plastic aprons, plastic sleeves, cotton and rubber gloves fall within Section 3(o)'s definition of "clothes"); *Hudson,* 2009 WL 3486780 (bump caps, mesh vests, plastic sleeves, aprons, rubber gloves, mesh gloves, Kevlar gloves, mesh aprons, belly guards, scabbards, plastic gloves and knife holders were "clothes" under Section 3(o)); *Gatewood v. Koch Foods of Mississippi, Inc.,* 569 F. Supp. 2d 687 (S.D. Miss. 2008) (holding that rubber shoe covers, rubber or latex gloves, mesh gloves, plexiglass sleeves, plastic aprons, eye protection and cotton gloves, in addition to non-unique PPE, "fit comfortably" within Section 3(o)'s definition of clothes): *Davis v. Charoen Pokphand (USA), Inc.,* 302 F. Supp. 2d 1314, 1317-21 (M.D. Ala. 2004) (holding that rubber gloves, cutting gloves, apron, arm guards and plastic sleeves were clothes under Section 3(o)); *Saunders v. Morrell & Co.,* No. C88-4143, 1991 WL 529542 (N.D. Iowa Dec. 24, 1991) (holding that safety equipment such as mesh gloves, goggles, helmets, arm guards, boots, steel-mesh aprons, and other protective gear constituted "clothes" within the meaning of Section 3(o)); *Sisk,* 590 F. Supp. 2d at 1009 (concluding that specialized PPE, including belly guards, arm guards, scabbards/knife pouches, cut-resistance gloves, and cut-resistant sleeves were "clothes" consistent with the common, ordinary meaning of that term); *Anderson v. Pilgrim's Pride Corp.,* 147 F. Supp. 2d 556 (E.D. Tex. 2001), *aff'd* 44 Fed. Appx. 652 (5th Cir. 2002) (in addition to standard PPE, rubber aprons, rubber gloves, cotton gloves, scabbards, arm guards, arm mesh, mesh aprons, back mesh, wizard glove, and gaiters were held to fall within Section 3(o)'s definition of "clothes").

district.'" *Garcia v. Tyson Foods, Inc.*, 534 F.3d 1320, 1329 (10th Cir. 2008) (quoting *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991)). "[D]istrict court decisions cannot be treated as authoritative on issues of law. The reasoning of district judges is of course entitled to respect, but the decision of a district court cannot be a controlling precedent." *Bank of Am., N.A. v. Moglia*, 330 F.3d 942, 949 (7th Cir. 2003). *See also Pears v. Mobile County*, 645 F. Supp. 2d 1062, 1076 n. 18 (S.D. Ala. 2009) ("it is black-letter law that the decision of one federal district court is not binding on another federal district court, or even on the same judge in another case").

Judge Bataillon's holding in *Farmland* also is contrary to the view taken by five of the six Circuit Courts that have considered the issue. This includes the Sixth Circuit's comprehensive analysis of the Section 3(o) authorities in *Franklin v. Kellogg Co.*, No. 09-5880, 2010 WL 3396843 (6th Cir. Aug. 31, 2010), that was decided **after** *Farmland Foods*.

Judge Bataillon based his holding that the personal protective equipment worn by employees in *Farmland* did not qualify as "clothes" within the meaning of Section 3(o) exclusively upon the Ninth Circuit's interpretation in *Alvarez* that Section 3(o) is an exemption or exclusion that must be construed against the employer. However, that narrow construction of Section 3(o) has been universally rejected by every other circuit that has considered the issue, including the Fourth, Fifth, Sixth, and Eleventh Circuits. *Sepulveda*, 591 F.3d at 211; *Allen*, 593 F.3d at 458-59; *Franklin*, 2010 WL 3396843, at *4; *Cagle's*, 488 F.3d at 957. Therefore, based on the subsequent authorities that have repudiated the primary basis for the Ninth Circuit's holding in *Alvarez*, this Court should not defer to *Farmland Foods*.

Likewise, this Court should not rely on *Spoerle v. Kraft Foods Global, Inc.*, 527 F. Supp. 2d 860 (W.D. Wis. 2007), for the proposition that personal protective equipment is not "clothes"

under Section 3(o) since that ruling was repudiated by the Seventh Circuit in *Spoerle v. Kraft Foods Global, Inc.,* 614 F.3d 427, 428 (7th Cir. 2010). Chief Judge Bataillon is mistaken in *Farmland Foods* when he referred to the Seventh Circuit's ruling that the protective gear is not "clothing" under Section 3(o) as "dicta," given that the ruling on that point was a direct holding rejecting one of the plaintiffs' two principal arguments on appeal. Specifically, in rejecting plaintiffs' argument that protective gear was not "clothing," the Seventh Circuit summarily concluded that this argument was a "loser," relying on the Fourth Circuit's analysis in *Sepulveda v. Allen Foods. Id.*

The Court also should disregard the ruling in *In Re Cargill Meat Solutions Wage & Hour Litig.,* 632 F. Supp.2d 368 (M.D. Pa. 2008), that there was a question of fact in that case about whether the protective equipment qualified as "clothes" under Section 3(o) because there, too, the court improperly placed the burden of proof upon the employer and mistakenly construed Section 3(o) as an exemption as opposed to a definition of "hours worked" under the FLSA. Moreover, the *In re Cargill* court lacked the guidance from the Circuit Courts on the issue, since the case was decided before the overwhelming majority of Circuit Courts had adopted an expansive interpretation of the term "clothes" under Section 3(o).

This Court also should not place any reliance on the DOL's June 16, 2010 Administrator's Interpretation. *See Franklin,* 2010 WL 3396843, at *5-6 (rejecting any reliance upon the June 16, 2010 Interpretation because it conflicted with earlier opinion letters and was contrary to the language of the statute); *Sepulveda,* 591 F.3d at 209, n. 3 (basing its opinion on the language of the statute and rejecting any reliance on "gyrating agency letters on the subject"); *McDonald v. Kellogg Co.,* 08-cv-2473, 2010 WL 3724649, at *8 (D. Kan. Sept 16, 2010) (agreeing with the Fourth and Sixth Circuits that the DOL's "continuing

'gyrations'" on Section 3(o) were not worthy of any deference and further stating that the DOL's rationale was not persuasive to the court).

In addition to being inconsistent with the June 6, 2002 and May 14, 2007 DOL Opinion Letters that the Eleventh Circuit in *Anderson v. Cagle's, Inc.* held were better-reasoned and more persuasive than the DOL's 2001 and 1997 Opinion Letters, the June 16, 2010 Administrator's Interpretation is premised on several flawed assertions, including the claim that "dictionary definitions offer little useful guidance" in determining the meaning of the word "clothes" and the term "changing clothes" in Section 3(o). *See* 2010 Administrator's Interpretation at 2. As emphasized by the Sixth Circuit, regardless of the outcome they have reached, courts consistently have referred to and relied upon dictionary definitions to discern the plain meaning of the words that appear in a text of a statute, including the text of Section 3(o). *Franklin,* 2010 WL 3396843, at *7 (citing authorities). While relying heavily upon the Ninth Circuit's holding in *Alvarez v. IBP, Inc.,* 339 F.3d 894 (9th Cir. 2003*), aff'd on other grounds*, 546 U.S. 21 (2005), the DOL conveniently fails to mention in its June 16, 2006 Administrator's Interpretation that the Ninth Circuit's rationale was based on its flawed assumption, universally rejected by other circuits, that Section 3(o) should be narrowly construed as an "exemption" to the FLSA. *See Cagle's,* 488 F.3d at 957-58.

The Administrator's Interpretation also misconstrues Section 3(o)'s legislative history in asserting that the "clothes" Congress had in mind when it passed Section 3(o) were those worn by workers in the bakery industry. That assertion is plainly wrong since Congressman Herter's reference to collective bargaining agreements in the bakery industry was simply offered as one example of a situation in which parties to collective bargaining agreements in a particular industry had worked out various arrangements concerning when workers in that industry were

paid for donning and doffing the clothes they wore in performing their job duties. It is a monumental stretch for the DOL to claim, as it does in the Interpretation, that this comment by the sponsor of the bill that became Section 3(o) affords any guidance on whether the safety clothing and protective equipment worn by employees in various modern day work environments fall within Section 3(o)'s definition of clothing. [10]

### 3. Throughout the Relevant Time Period, CMSC and the Union Have Been Parties to a Bona Fide Collective Bargaining Agreement that by its Express Terms Excludes Pre- and Post-Shift Donning and Doffing From Compensable Work Time

The undisputed facts demonstrate that throughout the relevant time period, there has been a collective bargaining agreement in place between CMSC and the Union that expressly excludes pre- and post-shift clothes-changing from compensable time. Article 6.08 of the current CBA, which was negotiated after and in reliance on the June 6, 2002 DOL opinion letter and prior to the May 14, 2007 opinion letter that re-affirmed the 2002 opinion letter, provides as follows:

> The parties agree that the time employee spend changing clothes, including the donning and doffing of safety clothing and equipment worn in their jobs, and the time they spend washing up before and after paid production work, shall be excluded from the employee's paid workdays. The parties agree, however, that employees who are required to wear safety clothing and equipment as defined in the agreement between Cargill Meat Solutions and United Food and Commercial Workers Local 22 shall be paid for an amount of time as determined by joint time studies beyond paid production work to compensate them for the time they spend outside

---

[10] The DOL supports the conclusions reached in its June 16, 2010 Administrator's Interpretation by selectively citing and endorsing various court decisions that have addressed and decided Section 3(o) issues in the past several years. It is well-settled, however, that courts are not bound by an agency's interpretation of judicial precedent. *Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 43 n. 5 (1st Cir. 1999); *see also New York New York, LLC v. NLRB*, 313 F.3d 585, 590 (D.C. Cir. 2002) (the *Chevron* principle does not require deference to an agency's interpretation of Supreme Court precedent). Instead, it is the duty of the courts to interpret and apply judicial precedent to the facts of a particular case.

of paid production work cleaning their safety clothing and equipment.[11] (SOF ¶ 42.)

It is undisputed that this provision was added to the Schuyler collective bargaining agreement during negotiations that took place in October and November, 2005. When CMSC's chief negotiator proposed the language that appears in Article 6.08 to the Union on about October 26, 2005, he specifically referred to the 2002 Opinion Letter and informed the Union bargaining committee that, in the Company's opinion, the letter allowed the parties to negotiate over the compensability of donning and doffing safety clothing. (SOF ¶ 41.) Later in the same bargaining session, the Union's chief negotiator informed CMSC's chief negotiator that the Union agreed to Article 6.08 as proposed. Subsequently, the current collective bargaining agreement, including Article 6.08, was voted on and approved by the Union's membership. (SOF ¶ 42.)

It is also undisputed that since 2005, CMSC and the Union have excluded pre- and post-shift donning and doffing of safety clothing and equipment from compensable time, but CMSC has continued to pay employees for doffing and re-donning that occurs before and after the employees' unpaid meal period, and also has paid them for post-shift walking time from their work area to the location where they wash their equipment, as well as for time they spend waiting to wash and washing the safety clothing and equipment they use in performing their job duties. (SOF ¶ 43.)

---

[11]    The "agreement" referenced in Article 6.08 that defines "safety clothing and equipment" is one entered into in May, 2000, which defines "safety clothing and equipment" as including the following items: mesh body suit, mesh apron, front mesh, back mesh, mesh gloves, mesh leggings, mesh sleeve, belly guard, shin guards, face guard, plastic arm guards, whizzard gloves, whizzard sleeves, rubber apron (when used with other listed items or required to be worn for safety reasons), scabbard for knives, hand guards, rubber gloves worn over mesh, and other like safety clothing, equipment and gear. (SOF ¶ 30.)

The parties, being fully informed of the relevant facts, "chose to exclude compensation" for clothes-changing time. *Gatewood v. Koch Foods of Mississippi, LLC*, 569 F. Supp. 2d 687, 700 (S.D. Miss. 2008). Because the Union bargained away under a bona fide CBA any right for compensation for this activity, Plaintiffs' claims concerning clothes-changing time are "untenable" under Section 3(o). *See, e.g., McDonald v. Kellogg Co.*, No. 08-2473, 2010 WL 3724649, at *9 (D. Kan. Sept. 16, 2010).

### 4.    *Plaintiffs' Walk Time Claims Must Fail Because Activities That Are Not Compensable Based On Section 3(o) Cannot be Principal Activities that Start the Continuous Workday*

The undisputed facts in this case demonstrate that throughout the relevant time period, Schuyler gang time employees have been paid for the walk time from their work area to where they wash their equipment at the end of their work shift. (SOF ¶¶ 32, 43, 48.) Moreover, gang time employees have continued to be paid for this walk time despite the fact that they no longer wash their PPE at the end of the shift. (SOF ¶ 29.)

Therefore, the only walk time issue in this case pertains to that which occurs at the beginning of the shift. However, once again the facts are undisputed that since at least May 1, 2010 in the Fabrication department (since December 2009 in the Slaughter/Kill department), CMSC has distributed non-standard PPE to employees at their work station. It is also undisputed that employees take home, or have the option to take home, on a daily basis their standard PPE, such as boots, hard hat, etc. (SOF ¶ 9.) Thus, after May 2010, even if employees don their standard PPE at home, in the locker room, or carry it from the locker room to the workstation, there simply is no compensable activity preceding the pre-shift walk time.

For many years, the Department of Labor ("DOL") has taken the position that if employees have the option and the ability to change at home into protective clothing and gear required for their jobs, changing into and out of the clothing and gear is not compensable, even

when it takes place at the plant. *See* DOL Field Operations Handbook section 31b13. The DOL re-affirmed that position in the May 31, 2006 Wage and Hour Advisory Memo ("WHAM") that discussed the implications of the Supreme Court's decision in *IBP, Inc. v. Alvarez*. Numerous courts have followed the bright-line position taken by the DOL, holding that donning and doffing protective equipment is not compensable if employees are allowed to remove the equipment from the plant and put it on or take it off away from the plant.[12]

Since Plaintiffs have no viable walk time claim after May 2010 (or after December, 2009 for employees in the Slaughter department), the only remaining walk time issue pertains to that which took place from the beginning of the relevant time period until May 1, 2010 (or December 2009 in Slaughter department), when many but not all gang time employees donned their PPE in the locker room and then walked to their work area. (SOF ¶ 20.) However, because the pre-shift donning time was excluded from hours worked by Section 3(o) (SOF ¶ 42), the employees' compensable workday did not actually commence until the production line started at the beginning of gang time.

Under the Portal-to-Portal Act, "walking ... to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" is

---

[12] Examples include *Alford v. Perdue Farms,* No. 5:07-cv-87 (CAR), 2008 WL 879413 (M.D. Ga. Mar. 28, 2008) (court relied, in part, on fact that employees were allowed to remove standard safety equipment from the plant as a basis for its conclusion that donning and doffing such items was non-compensable); *Abbe v. City of San Diego,* Nos. 05cv1629 DMS (JMA), 06cv0538 DMS (JMA), 2007 WL 4146696 (S.D. Cal. Nov. 9, 2007) (police officers who were able to don their uniform and other required equipment at home need not be compensated for donning and doffing activities); *Bamonte v. City of Mesa,* No. CV 06-1860-PHX-NVW, 2008 WL 1746168 (D. Ariz. April 14, 2008) (same), aff'd, 598 F.3d 1217 (9th Cir. 2010); *Dager v. City of Phoenix*, No. 2:06-cv-01412 JWS, 2009 WL 531864 (D. Az. Jan 21, 2009) (police department's take home policy made donning and doffing of uniforms and equipment non-compensable because many officers at least partially changed into their uniforms and equipment at home without regard to any alleged risks), aff'd, No. 09-15356, 2010 WL 2170992 (9th Cir. May 28, 2010).

specifically excluded from the coverage of the FLSA. *See* 29 U.S.C. § 254 (a)(1). Thus, Plaintiffs' claim for walk time can only succeed if one accepts the "illogical result in which a Section 3(o) activity, if determined to be a principal activity, would not be compensable but would begin the workday, converting otherwise non-compensable activity, such as walk time incurred after completing the Section 3(o) activity, into compensable activity." *Sisk v. Sara Lee Corporation,* 590 F. Supp.2d 1001, 1010 (W.D. Tenn. 2008) declined to follow for other reasons by *Franklin v. Kellogg Co.*, No. 09-5880, 2010 WL 3396843 (6th Cir. Aug. 31, 2010). *See also Hudson v. Butterball, LLC,* No. 08-5071, 2009 WL 3486780, at *4 (W.D. Mo. Oct. 14, 2009) (holding that because time spent by plaintiff sanitizing, donning and doffing PPE was excluded from hours worked by Section 3(o), plaintiff's intervening walking time was not compensable because it did not follow or precede a principal activity); *Hosler v. Smithfield Packing Company,* 7:07CV166-H, 2010 U.S. Dist. LEXIS 101915 (E.D.N.C. Sept. 27, 2010) (adopting magistrate's ruling that clothes changing or washing that is subject to 3(o) cannot be deemed a principal activity, or integral and indispensable to a principal activity, and therefore cannot start or extend the compensable workday). The courts' holdings in *Sisk, Hudson,* and *Hosler* are consistent with the position taken by the DOL in its May 14, 2007 Opinion Letter that because Congress' intent in enacting Section 3(o) was to exclude clothes-changing activities from the statute's definition of hours worked, "activities covered by section 3(o) cannot be considered principal activities and do not start or extend the workday. Walking time after a 3(o) activity is therefore not compensable unless it is preceded by a principal activity." May 14, 2007 Opinion Letter at 1.

The DOL recently did an about-face and took the position on June 16, 2010 that "consistent with the weight of authority, it is the Administrator's interpretation that clothes

changing covered by § 203(o) **may** be a principal activity" and "where that is the case, subsequent activities, including walking and waiting, are compensable." (June 16, 2010 Administrator's Interpretation at 5) (emphasis supplied).) The latter interpretation, however, is not entitled to deference by this Court because the DOL not only failed to explain the reasoning behind its reversal of position, it likewise failed to explain why *Sisk* and *Hudson* were wrongly decided. Instead, it simply based its new interpretation on its assessment of the "weight of authority." (*Id.*) However, as previously explained, opinion letters that are based on an agency's interpretation of legal precedent, as opposed to the language of the statute it is charged with administering, are not entitled to *Chevron* deference. *See, e.g., Valerio v. Putnam Assocs. Inc.,* 173 F.3d 35 (1st Cir. 1999).

Finally, and most importantly, the DOL's current interpretation defies both logic and clear statutory language. With all due respect to the district court holdings in *Figas v. Horsehead Corp.,* No. 06-1344, 2008 WL 4170043 (W.D. Pa. Sept. 3, 2008); *In Re Tyson Foods, Inc.,* 694 F. Supp. 2d 1358 (M.D. Ga. 2010); and the other cases cited by the DOL, all of those courts overlooked the key, fundamental fact that according to its plain language, Section 3(o) is an exception to the statutory definition of "hours worked." 29 U.S.C. § 203(o). If the parties to a collective bargaining relationship have agreed to exclude clothes-changing activities from compensable time, and that time therefore cannot be counted as part of the affected employees' "hours of work," that activity simply cannot be deemed to start the compensable workday regardless of whether it is considered to be a "principal activity" within the meaning of the Supreme Court's decision in *IBP, Inc. v. Alvarez*. To hold otherwise would be to ignore the purpose of the Portal-to-Portal Act, which was to ensure that preliminary and postliminary activities, including travel and pre-shift walk time, are not included as part of the compensable

workday. Yet, that is precisely the result of the well-intended but misdirected authorities cited in the DOL's June 16, 2010 Interpretation.

Based on the plain meaning of Section 3(o), its legislative history, and the overwhelming weight of decided case law, the donning and doffing, walking, waiting and washing activities at issue in this case are not compensable and cannot be part of the continuous workday. Therefore, CMSC is entitled to summary judgment with respect to those claims.

### D. Section 259 of the FLSA Affords CMSC a Complete Defense to Plaintiffs' Donning, Doffing, Walking and Related Claims

Throughout the relevant time period, CMSC has relied in good faith upon the 2002 and 2007 Opinion Letters issued by the Administrator of the Department of Labor's Wage and Hour Division as the basis for implementing and then continuing its compensation practices at the Schuyler Plant, including those specifically relating to donning and doffing the safety clothing and protective equipment worn by production employees, as well as walk time spent after performing such activities. Therefore, Section 259 of the FLSA alternatively serves as a complete defense to liability for Plaintiffs' pre- and post-shift donning, doffing and walking time claims at the Schuyler plant. *See* 29 U.S.C. § 259.

Section 259 of the FLSA, enacted in 1947 as Section 10 of the Portal-to-Portal Act, provides in relevant part, that:

> ... no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation ... if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement

33

> policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.
>
> (b) The agency referred to in subsection (a) of this section shall be
>
>> (1) in the case of the Fair Labor Standards Act of 1938, as amended, … the Administrator of the Wage and Hour Division of the Department of Labor. 29 U.S.C. § 259.

The DOL considers opinion letters issued by the Administrator of the Wage and Hour Division, specifically the June 6, 2002 and May 14, 2007 Opinion Letters, as "rulings" within the meaning of Section 259. 29 C.F.R. § 790.17(d).

To be insulated from liability based on Section 259, an employer must show that: (1) its compensation policies were adopted and/or maintained in reliance on the DOL's regulations or an opinion letter issued by the Administrator of the Wage and Hour Division; (2) its policies were in conformity with that interpretation; and (3) that it acted in good faith. *See Hultgren v. County of Lancaster, Nebraska,* 913 F.2d 498, 507 (8th Cir. 1990) (citing *Cole v. Farm Fresh Poultry, Inc.*, 824 F.2d 923, 926 (11th Cir. 1987)); *see also Bouchard v. Reg'l Governing Bd. Of Region V Governing Mental Retardation Servs.*, 939 F.2d 1323, 1327 (8th Cir. 1991); *Frank v. McQuigg,* 950 F.2d 590, 598 (9th Cir. 1991). Where the Section 259 defense is established, "'it acts to deprive the court of any further jurisdiction[.]" *Marshall v. Baptist Hosp., Inc.*, 668 F.2d 234, 239 6th Cir. 1981) (quoting lower court opinion, *Marshall v. Baptist Hosp., Inc.*, 473 F. Supp. 465, 477 (M.D. Tenn. 1979)); *Bouchard*, 939 F.3d at 1334 (quoting *Marshall* and holding that the Section 259 defense is "'jurisdictional in nature.'").

A more clear case of good faith reliance cannot be made. Here, the undisputed facts show not only that CMSC relied in good faith upon the 2002 and 2007 Opinion Letters to support the adoption and continuation of its compensation practices for donning and doffing-related activities performed by employees at its Schuyler Plant, CMSC was actively involved in

obtaining both of the Opinion Letter letters on which it subsequently relied. (SOF ¶¶ 34-37, 45-46, 49-51.) Therefore, CMSC is entitled to judgment as a matter of law on Plaintiffs' pre- and post-shift donning, doffing and walking time claims.

### 1. Through Its Participation In Obtaining The Two Opinion Letters, There Can Be No Dispute That CMSC's Practices Were Adopted And Maintained In Actual Reliance On Those Letters

The undisputed facts demonstrate that CMSC implemented and continued the challenged pay practices in actual reliance on the 2002 and 2007 Opinion Letters. Indeed, CMSC personnel were personally involved in securing both the 2002 and 2007 Opinion Letters from the DOL.

Pursuant to the 2000 Agreement between the Union and CMSC, Union employees at Schuyler received pay for time spent donning and doffing specified types of PPE, as well as time spent walking from their individual work stations to the washing areas, time spent waiting to wash their PPE, and time spent actually washing the PPE. (SOF ¶¶ 30-33.) In late 2001, AMI made a formal request to the DOL on behalf of the meatpacking industry, asking the DOL to reconsider the position it had taken in prior Opinion Letters on the topic in 1997 and 2001. (SOF ¶ 34.) In connection with that request, CMSC personnel attended a meeting with AMI and the DOL, reiterating that request. (SOF ¶¶ 35-36.) Thereafter, the DOL issued its 2002 Opinion Letter, precisely addressing the issue regarding whether the type of PPE worn in the meatpacking industry qualified as "clothing" under Section 3(o). (SOF ¶ 37.)

At the time the DOL issued its 2002 Opinion Letter, the 2000 Agreement specifically provided for agreed-upon amounts of pay for time devoted to donning and doffing their safety clothing and protective equipment at the beginning and end of their shift and before and after their unpaid lunch period, as well as post-shift walk time, wait time and post-shift equipment washing time. (SOF ¶¶ 32-33.) CMSC was contractually bound to continue those compensation practices until the CBA expired in November, 2005. (SOF ¶ 30.)

During collective bargaining negotiations that took place in October and November 2005, CMSC presented a proposal to the Union to exclude donning and doffing time from Schuyler employees' pay, consistent with the pronouncement in the 2002 Opinion Letter. (SOF ¶¶ 38-40.) Indeed, it is undisputed that CMSC's chief negotiator specifically referenced the 2002 Opinion Letter at the bargaining table when the Union and CMSC were negotiating the 2005 CBA. (SOF ¶ 41.) As such, actual reliance on the 2002 Opinion Letter for the pay practices implemented in 2005 and maintained through the liability period has been clearly established. The 2005 collective bargaining agreement remains in effect and does not expire until November 14, 2010. (SOF ¶ 4.)

In April 2006, CMSC independently requested another opinion letter from the DOL seeking clarification of the 2002 Opinion Letter. (SOF ¶¶ 45-46.) The DOL responded to that request by issuing the 2007 Opinion Letter, which reaffirmed that "clothes" under Section 3(o) includes the safety clothing and protective gear worn by employees in meatpacking plants, that CMSC could indeed continue to rely on the 2002 Opinion Letter everywhere outside of the Ninth Circuit—where employers are subject to the *Alvarez* court's ruling on "clothes" under Section 3(o)—and, further, that activities covered by Section 3(o) do not start the compensable workday such that "walking time after a 3(o) activity is therefore not compensable unless it is preceded by a principal activity." (SOF ¶¶ 49-50.)

In short, not only did CMSC have knowledge of the 2002 and 2007 DOL Opinion Letters, CMSC in fact was involved in obtaining both of those opinion letters. Based on these facts, there can be no dispute that in developing and maintaining the challenged pay practices, CMSC actually relied on the 2002 and 2007 Opinion Letters. *Bouchard*, 939 F.2d at 1328 (actual reliance proved where employer obtained interpretations and letters from trade organization

directly involved in requesting the DOL guidance for the specific industry implicated); *see also Sisk v. Sara Lee*, 590 F.Supp.2d at 1013 (actual reliance demonstrated where employer revised its compensation policy as a result of the 2002 Opinion Letter).

While Plaintiffs will presumably point to *In Re Cargill Meat Solutions Wage & Hour Litig.*, 632 F. Supp. 2d 368 (M.D. Pa. 2008), in support their argument that Section 259 does not act as a defense here, that case is distinguishable. The evidence in that case showed that defendant established its custom and practice of not paying for PPE donning and doffing time *before* June 6, 2002, at a time when the DOL's contrary opinion letters were in effect.[13] The court therefore ruled that there was an issue of fact regarding whether Cargill, there, had relied upon the 2002 Opinion Letter as the basis for its practice. *Id.* at 390. Here, in contrast, the undisputed facts demonstrate that *after* the 2002 Opinion Letter, CMSC changed its compensation practices after negotiating a provision in its collective bargaining agreement to exclude PPE pre- and post-shift donning and doffing time in *express* reliance upon the DOL's 2002 opinion letter. (SOF ¶¶ 38-42.)

## 2. CMSC's Pay Practices Were In Conformity With The Opinion Letters

CMSC has also established that there is no dispute of material fact with respect to whether the pay practices at issue in this motion conformed to the positions set forth in the 2002 and 2007 Opinion Letters. Once CMSC was in a position to negotiate changes in its pay practices with the Union after the issuance of the 2002 Opinion Letter, when the CBA was up for renegotiation in 2005, CMSC successfully did so. (SOF ¶¶ 38-42.) Because it is undisputed that the current CBA actually contains language specifically addressing the topic of pay for donning

---

[13] For the same reason, because the pay practice at issue predated the 2002 Opinion Letter, the ruling on the applicability of the Section 259 defense in *Figas v. Horsehead Corp.*, Civ. Action No. 06-1344, 2008 WL 4170043, at *22-23 (W.D. Pa. Sept. 3, 2008), is also easily distinguishable.

and doffing activities, CMSC has shown that it acted in conformity with the 2002 Opinion Letter's interpretation that Section 3(o) is satisfied with "express" contractual language negotiated between a union and a company.[14]  (SOF ¶ 42.)  Moreover, while CMSC negotiated with the Union to exclude time spent in the pre- and post-shift donning and doffing of PPE, and the time spent walking to their workstations as well as the time spent washing of the employees' bodies, CMSC continued to pay for all other incidental time associated with donning and doffing.  (SOF ¶ 43.)  Specifically, CMSC continued to pay for time spent walking from the workstation to the wash stations, waiting to wash, and washing the PPE, and for doffing and donning activities before and after the meal period.  (Id.)

As such, these pay practices have been completely in concert with the position in the DOL's 2002 Opinion Letter stating that Section 3(o) allowed the parties to a collective bargaining relationship to agree to make clothes-changing activities in the meatpacking industry non-compensable.  Although the 2002 Opinion Letter did not specifically address the issue of pay for walking time after the act of donning mesh and other PPE rendered non-compensable as a result of Section 3(o), that pay practice was not inconsistent with the 2002 Opinion Letter and in fact was a reasonable conclusion to make as a result of the specific position set forth in the 2002 Opinion Letter.  Indeed, the fact that it was reasonable for CMSC to assert that a preliminary act following a non-compensable act is likewise non-compensable is made evident by the fact that the DOL clarified that precise issue in its 2007 Opinion Letter.  (SOF ¶ 50.)

---

[14]   The *Figas* court's ruling on the "conformity" prong of the analysis again is distinguishable because there the court concluded that the employer could not have acted in conformity with the 2002 and 2007 Opinion Letters because the collective bargaining agreement was silent on the topic of pay for donning and doffing activities.  *Figas,* 2008 WL 4170043, at *23.  Here, the CBA has express language on the topic.

In a case involving very similar facts in a hog processing plant, the District Court for the Middle District of Tennessee easily concluded that even though the employer excluded not only donning and doffing time under Section 3(o), but also walking time thereafter, it nevertheless acted in conformity with the 2002 Opinion Letter even though the employer "did not yet have the benefit of the 2007 opinion's clarification." *Sisk*, 590 F. Supp. 2d at 1012-13. Similarly, the Eighth Circuit reached the identical conclusion in a different context where the employer implemented a pay practice in mid-1985 that excluded sleeping time at a group home based on a 1981 DOL regulation that provided that subject employees "get at least 5 hours sleep during the scheduled period." *Bouchard*, 939 F.2d at 1332. Although the regulation did not specifically provide that the five hours need not be consecutive hours for the exclusion to apply, the employer interpreted the regulation to so provide and implemented its pay practice accordingly. *Id.* Thereafter, the DOL clarified that regulation in an opinion letter, specifically providing that the five hours need not be continuous in order for the pay exclusion to be applicable, thereby affirming the legitimacy of the employer's practice. *Id.* In that circumstance, where the employer's interpretation of the regulation was reasonable on its face and later confirmed explicitly by the DOL, the Eighth Circuit Court of Appeals concluded that the employer had acted in conformity with the DOL's interpretations. *Id.* Accordingly, CMSC's pay practices at discussed in this motion were in total conformity with the 2002 and 2007 Opinion Letters.[15]

---

[15]    In any event, the undisputed facts demonstrate that, at a minimum, CMSC unquestionably can assert the Section 259 defense to Plaintiffs' post-donning/pre-doffing walk time claims from May 14, 2007, when the DOL first formally opined on whether a Section 3(o) activity could mark the beginning of the compensable workday, until June 16, 2010, when the DOL issued its most recent opinion letter reversing that interpretation. For that reason, the holding in *In Re Tyson* that good faith was lacking where the Opinion Letter did not address activities falling outside the scope of Section 3(o) is not persuasive here. 694 F. Supp. 2d 1358, 1371-72 (M.D. Ga. 2010).

### 3. *CMSC's Reliance On The Opinion Letters Was In Good Faith*

Finally, it cannot be disputed that CMSC's reliance on the 2002 and 2007 Opinion Letters, which it was responsible for obtaining, was in good faith. The legislative history of the Portal-to-Portal Act makes it clear that an employer's "good faith" is not to be determined merely from the actual state of his mind. "Good faith" also depends upon an objective test—whether the employer in acting or omitting to act as he did, and in relying upon a particular regulation or opinion letter, acted as a reasonably prudent man would have acted under the same or similar circumstances. *See Bouchard,* 939 F.2d at 1328; *Cole,* 824 F.2d at 926; *Olson v. Superior Pontiac-GMC, Inc.,* 765 F.2d 1570, 1579 (11th Cir. 1985); *see also,* 29 C.F.R. § 790.15(a). As the Ninth Circuit further noted in *McQuigg,* "the Portal Act and its regulations strongly imply that an employer who relies on and conforms to an Opinion Letter which specifically addresses him and his circumstances is acting in good faith." *McQuigg,* 950 F.2d at 598-599 (citing 29 C.F.R. § 790.15(b)).

CMSC was a direct participant in the process that led to issuance of both the 2002 Opinion Letter and the 2007 Opinion Letter, both of which expressly and directly addressed the circumstances at the Schuyler plant. (SOF ¶¶ 34-36, 45-46.) CMSC's good faith reliance has continued from the beginning of the FLSA limitations period relevant to this lawsuit which commenced, at the earliest, on April 23, 2006 at least through June of this year when the DOL retracted from its previous position. Throughout that time period, there has been no ruling in this judicial circuit that casts any doubt on the validity of either of the Opinion Letters. In fact, all Courts of Appeal that have addressed the issue, with the sole exception of the Ninth Circuit, have agreed with the position taken in the 2002 and 2007 Opinion Letters that Section 3(o) allows employers in the meatpacking industry to negotiate to exclude PPE donning and doffing time from the compensable workday. *See Franklin v. Kellogg Co.*, No. 09-5880, 2010 WL 3396843

40

(6th Cir. Aug. 31, 2010); *Spoerle v. Kraft Foods Global Inc.*, 614 F.3d 427 (7th Cir. 2010); *Allen v. McWane, Inc.*, 593 F.3d 449 (5th Cir. 2010); *Sepulveda v. Allen Family Foods*, 591 F.3d 209 (4th Cir. 2009); *Anderson v. Cagle's, Inc.*, 488 F.3d 945 (11th Cir. 2007).

Accordingly, CMSC was entitled to, and in fact, has relied in good faith upon the 2002 and 2007 Opinion Letters as the bases for continuing its donning and doffing compensation practices at the Schuyler Plant. Therefore, Section 259 serves as a complete defense and jurisdictional bar against Plaintiffs' pre- and post-shift donning, doffing and walking time claims.

E.    **CMSC Is Entitled to Summary Judgment On Plaintiffs' State Law Claims**

  *1.    Judgment As A Matter of Law Must Be Entered For CMSC On Plaintiffs' Wage Payment and Collection Act Claims*

In Count II of the *Haferland* Complaint, Plaintiffs also assert a claim for overtime wages under the Nebraska Wage Payment and Collection Act ("NWPCA").[16] In essence, Plaintiffs claim (a) that they are owed overtime wages for time spent in activities that fall outside of the agreed upon compensation plan set forth in the CBA, including the specific language of Article 6.08 of the CBA, which governs the payment of wages to employees for "clothes changing" time; and (b) that they are owed additional compensation for paid activities under that same agreement. However, because the claimed overtime wages are (a) not owed pursuant to the agreement between the parties regarding overtime compensation, and (b) were paid in amount set after a joint time study conducted by the Union and CMSC, Plaintiffs' NWPCA claim fails.

The NWPCA defines wages as "compensation for labor or services rendered by an employee . . . *when previously agreed to and conditions stipulated have been met* with the employee, whether the amount is determined on a time, task, fee, commission or other basis." NEB. REV. STAT. § 48-1229(4) (emphasis added). As the Nebraska Appellate Court has

---

[16]    The *Martinez* Complaint does allege any claims under Nebraska state law.

expressly ruled, the NWPCA does not require the payment of compensation for overtime "where there is *no previous agreement* regarding overtime compensation." *Freeman v. Cent. States Health & Life Co. of Omaha*, 2 Neb. App. 803, 807, 515 N.W.2d 131, 134-35 (Neb. App. Ct. 1994) (emphasis added). In other words, the NWPCA does not provide a cause of action for overtime wages unless there was a previous agreement calling for the payment of such wages. *Id.*, 515 N.W.2d at 134-35. As a corollary to that principle, it is also true that a party cannot rely on the NWPCA to enforce rights that may be available to it under the FLSA. *Id.* at 808, 515 N.W.2d at 135.

Here, the agreement between the parties specifically provides for the payment of wages – including overtime wages – for the time Plaintiffs spent walking from the workstation to the wash stations, waiting to wash their PPE, cleaning their PPE and in performing donning and doffing activities before and after their meal periods. (SOF ¶¶ 15-17, 42-43.) On this point, specifically, Article 6.08 of the CBA provides:

> . . . The parties agree, however, that employees who are required to wear safety clothing and equipment as defined in the agreement between Cargill Meat Solutions and United Food and Commercial Workers Local 22 shall be paid for an amount of time *as determined by joint time studies* beyond paid production work to compensate them for the time they spend outside of paid production work cleaning their safety clothing and equipment.

(SOF ¶ 42.) (emphasis added)    In addition, under Article 6.08 of the CBA, CMSC also continued to pay for time spent donning and doffing safety clothing and equipment immediately before and after their unpaid meal periods, based on the results of joint time studies. (SOF ¶¶ 15-17.) Thus, there is no dispute that CMSC has complied with the CBA and fulfilled its obligation of relying on the joint time studies to make the payments at issue. In other words, CMSC paid employees wages, including overtime wages, for the precise activities and the

precise amount of time "previously agreed to" with the employees' representative. Therefore, Plaintiffs cannot state a claim under the NWPCA for this disputed time.

In addition, Plaintiffs contend that there are *other* activities that they performed – which are *excluded* from the CBA, for which they should have received pay. (SOF ¶¶ 18-19.) Under the CBA in effect from November 2005 to the present, the parties expressly agreed that CMSC would *not pay* for "the time employees spend changing clothes, including the donning and doffing of safety clothing and equipment worn in their jobs, and the time they spend washing up before and after paid production work". (SOF ¶ 42.) Without an agreement to pay for such activities, Plaintiffs cannot make a claim for compensation for that time under the NWPCA. *Loves v. World Ins. Co.*, 277 Neb. 359, 773 N.W.2d 348 (2009) (under 48-1229, no wage is payable "unless it was previously agreed to an all the conditions stipulated have been met.").

Nor can Plaintiffs use the FLSA as a predicate for any such claim under the NWPCA. *Freeman*, 2 Neb. App. at 807-08, 515 N.W.2d at 135. The NWPCA does not define the concept of "hours worked" or even the term "work." Even so, according to the court in *Freeman*, just because an activity may constitute "hours worked" under the FLSA, that fact does not make that same time compensable under the NWPCA. *Id.*, at 808, 515 N.W.2d at 135 ("federal courts have held that the FLSA is the exclusive remedy for the enforcement of rights created under the FLSA."). Citing *Freeman*, the District Court for the District of Nevada reached the same conclusion in a case brought by hourly employees seeking unpaid overtime under the FLSA as well as the NWPCA. In dismissing the NWPCA claim, the court held that:

> Plaintiffs' Complaint does not allege Plaintiff and Defendants entered into a previous agreement for overtime compensation. Accordingly, Plaintiff fails to state a claim for overtime compensation under Nebraska's wage and hour statute. Although Plaintiff attempts to argue the FLSA is an implied term of the employment contract, Nebraska has rejected this view,

> requiring the employee to assert such a claim under the FLSA, not
> Nebraska's wage and hour statute.

*In Re Wal-Mart Wage and Hour Employment Practices Litig. and All Related Cases*, 490 F.

Supp. 2d 1091, 1132 (D. Nev. 2007).   In other words, the mere existence of an employment

relationship does not equate to the finding of an agreement to pay for hours worked under the

NWPCA.   Therefore, under the NPWCA, Plaintiffs cannot state a claim for pay for activities that

are not contained in the CBA.   Accordingly, CMSC is entitled to judgment as a matter of law on

Plaintiffs' NPWCA claim.

### 2.   *Judgment As A Matter of Law Must Be Entered For CMSC On Plaintiffs' NWHA Claim*

#### a.   *Plaintiffs Cannot State a Claim for Minimum Wage Law Violations*

In Count I of the *Haferland* Complaint, Plaintiffs also contend that they are owed unpaid

wages under the Nebraska Wage and Hour Act (NWHA), NEB. REV. STAT. § 48-1201 *et seq.*

(*Haferland* Compl. ¶¶ 37-42.)   Specifically, Plaintiffs claim that they spend up to 98 minutes per

day – or as many as 9.8 hours in a six-day workweek – in donning, doffing and related activities

for which they are not compensated.   The record establishes, however, that throughout the class

period, Plaintiffs were paid more than the applicable minimum wage and, therefore there is no

dispute that CMSC fully complied with the NWHA. (SOF ¶ 11.)

The NWHA is not an overtime statute.   Rather, Section 48-1203 simply sets forth a

minimum hourly wage rate, which is identical to the federal minimum wage rates set forth in the

FLSA:  $5.15 through July 23, 2007, $5.85 from July 24, 2007 through July 23, 2008, $6.55

from July 24, 2008 through July 23, 2009, and $7.25 from July 24, 2009 through the present.

NEB. REV. STAT. § 48-1203.   The NWHA further provides that violations of the statute make an

employer liable to the employees affected "in the amount of their unpaid *minimum wages*[.]"

NEB. REV. STAT. § 48-1206 (emphasis added).

There are no implementing regulations that interpret the NWHA and the statute itself provides no guidance regarding when a minimum wage violation is deemed to have occurred. Similarly, no court has addressed how liability is established for a minimum wage violation under the statute.  However, not only does the NWHA mirror the federal minimum wage requirements of the FLSA, it was amended in 2007 to specifically track the FLSA provisions on minimum wages. *See* Floor Debate, LB 265, Neb. 100 Leg., 1st Sess. (May 29, 2007) at 32-33 ("This amendment simply ensures that Nebraska's law will mirror federal law." (Sen. Nantkes)). As such, violations of Section 48-1203 should be construed in the same manner as minimum wage violations under Section 206 of the FLSA.

It is well-settled that under the FLSA, a minimum wage violation occurs only if the total weekly wage paid to employees, divided by the number of hours worked, results in an hourly rate below the minimum established by statute.  For example, in *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir. 1986), the Eighth Circuit ruled that "'so long as the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement.'" (quoting *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960)).

Even assuming, solely for purposes of this motion that Plaintiffs are due the claimed additional compensation for engaging in unpaid donning and doffing activities, the undisputed facts show that Plaintiffs have already received more than the statutory minimum wage for all hours they allege to have worked.  Throughout the entire relevant period, Plaintiffs have earned at least $11.50 per hour.  That means that through July 2007, when the minimum wage was $5.15, Plaintiffs would have had to work *more than twice as many hours per week* in order for

their minimum wage rate to fall below the statutory rate. Here, Plaintiffs at most claim approximately 98 additional minutes per day (i.e., at most, approximately 10 hours in a 6-day workweek),[17] far shy of the double number of hours needed to state a claim.

Even during the liability period when the minimum wage rate is at its highest, being $7.25 between July 2009 and the present, CMSC would have to fail to compensate the lowest paid Plaintiff for as much as 41% of their time in order for that individual to state a claim under the NWHA. For example, in 2009 the lowest wage rate held by any Plaintiff was $12.40 per hour. (SOF ¶ 11.) If a Plaintiff earning $12.40 per hour worked eight hours per shift during a five-day week (forty hours in a week), he would earn gross weekly wages in the amount of $496. That amount of wages ($496) divided by the minimum wage of $7.25 per hour, equals 68.4 hours. Put another way, the lowest paid Plaintiffs in the class would have to work an additional 28.4 uncompensated *hours per week* in order for their wage rate to drop below the statutory minimum. Adopting Plaintiffs' allegation and assuming that an individual worked 50 hours during a week, 10 of which were uncompensated, his hourly rate would dip only to $9.92 per hour – a rate that is $2.67 per hour above the highest statutory minimum wage. It is undisputed that no Plaintiff or putative class member worked so much additional unpaid time as to fall below the minimum wage rate.

### 3.   *Even If Plaintiffs Could State An Overtime Claim, The NWHA Should Be Construed Consistent With The FLSA*

Curiously, in Count I of the *Haferland* Complaint, Plaintiffs are also claiming *overtime* wages under the NWHA. (*Haferland* Compl. Count I, ¶ 42 (emphasis added).) Initially, no court has ever held that the NWHA provides a cause of action for overtime wages. There is no

---

[17]   Plaintiff Martinez alleged he worked as many as 98 uncompensated minutes per day. (SOF ¶ 18.)

dispute that on its face, the statute does little more than set forth the requisite minimum wages. The NWHA's express purpose is:

> (1) *to establish a minimum wage* for all workers . . ., and
> (2) *to safeguard existing minimum wage compensation standards* . . . .

NEB. REV. STAT. § 48-1201 (emphasis added). In light of its express purpose and in the absence of any regulatory or case law authority suggesting otherwise, the Court should not create a cause of action that does not exist. The District Court for the District of Nevada recently reached that very conclusion in *In re Wal-Mart*, 490 F. Supp. 2d at 1132. There, the plaintiffs sought relief for unpaid overtime compensation under the NWHA, among other state statutes. In dismissing the overtime claim under the NWHA, the court noted that the statute contains "no provision for maximum hours worked; rather the provisions refer only to a minimum wage." *Id*. This Court should adopt that finding here.

Even assuming that a claim for overtime wages could be made under the NWHA, given its silence on the topic of hours work and the state's legislative intent that the statute mirror the language of the FLSA, the meaning of "hours worked" under the NWHA should be construed in concert with the FLSA's definition of hours worked. The NWHA's definitions do not include a definition of "work" or "hours worked," and there are no implementing regulations nor any caselaw authority that interpret the meaning of those principles. However, in drafting the NWHA, Nebraska's legislature fully intended for the state law to parallel the FLSA's Section 206. *See* Floor Debate, LB 265, Neb. 100 Leg., 1st Sess. (May 29, 2007) at 32-33 ("This amendment simply ensures that Nebraska's law will mirror federal law." (Sen. Nantkes)). As such, violations of Section 48-1203 should be construed in the same manner as minimum wage violations under Section 206 of the FLSA. Thus, the NWHA should be interpreted consistent with interpretations of the FLSA.

For purposes of determining "hours worked" under Section 206 of the FLSA, and as set forth at length above, a court may look to the express provisions of a governing collective bargaining agreement to determine whether time spent in certain donning, doffing and washing activities have been excluded from paid time. 29 U.S.C. § 203(o).

Because the application of Section 3(o) to Plaintiffs' federal overtime claims warrants judgment in favor of CMSC, Section 3(o) also operates to preclude Plaintiffs from obtaining relief for overtime wages under the NWHA, to the extent overtime wages are even recoverable under the NWHA. Indeed, to find contrariwise would be to preclude Nebraska employers from adopting and maintaining collective bargaining agreement provisions available to employers under federal law. That result is not warranted, particularly where Nebraska lawmakers have not expressed any intent to legislate in a manner inconsistent with the FLSA.[18] Therefore, CMSC is entitled to judgment as a matter of law on Plaintiffs' claims for overtime compensation under the NWHA.

### 4. In the Alternative, Judgment Must Be Granted to CMSC Because Plaintiffs' State Law Claims Are Preempted By LMRA Section 301

There is no dispute here that the Union and CMSC bargained in good faith and agreed, in exchange for other employer concessions, to exclude from the employees' "hours worked" the limited time employees spent changing into and out of PPE and the time they spend washing up before and after paid production work. Consequently, to the extent Plaintiffs could even assert a claim for unpaid overtime wages under Nebraska state law, since those claims are dependent

---

[18] *Cf., East v. Bullock's, Inc.*, 34 F. Supp. 2d 1176, 1184 (D. Ariz. 1998) (where no Arizona case law suggests disapproval of the FLSA's rounding regulation or suggests that those regulations are inconsistent with the policies underlying Arizona wage laws, the state law should be construed in a manner consistent with the FLSA); *see also Topo v. Dhir*, 01 Civ. 10881, 2004 WL 527051, at *3 (S.D.N.Y. March 16, 2004) ("Although state regulations and legislative history do not elucidate the New York statute's use of 'part-time babysitter,' I do not find any support for the proposition that the New York exemption is to be construed more broadly than the federal exemption.").

upon analysis of the terms of the CBA, they are preempted by Section 301 of the Labor Management Relations Act ("LMRA"). 29 U.S.C. § 185 (a).

A state law claim is subject to "complete" or "field" preemption where Congress has regulated a field so pervasively, or federal law touches on a field implicating such a dominant federal interest, that an intent for federal law to occupy the field exclusively may be inferred. *San Diego Bldg. Trades Council Millmen's Union Local 2020 v. Garmon*, 359 U.S. 236, 242–43 (1959). As the Eighth Circuit has noted, the Supreme Court "has recognized the complete preemption doctrine primarily in labor cases involving state law claims that are preempted by [Section] 301 of the LMRA." *Schuver v. MidAmerican Energy Company*, 154 F.3d 795 (8th Cir. 1998) (citations omitted).

In *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985), the Supreme Court held that Section 301 of the LMRA preempts not only claims alleging a breach of collective-bargaining agreements, but also claims that are "substantially dependent upon analysis of the terms of an agreement made between the parties." *Id.* at 220; *Vacca v. Viacom Broad. of Missouri, Inc.*, 875 F.2d 1337, 1342 (8th Cir. 1989) (citing *Lueck*). In other words, if a state law claim is "inextricably intertwined with consideration of the terms of the labor contract" such that the labor contract "comes in to play" in examining the state law claims and defenses asserted thereto, then the claim is preempted by Section 301 of the LMRA. *Vacca*, 875 F.2d at 1342 (internal citations omitted); *see also Holschen v. Int'l Union of Painters & Allied Trades*, 598 F.3d 454, 460-61 (8th Cir. 2010).

Because Plaintiffs' state law claim for clothes-changing and washing time will require the Court to analyze and interpret the CBA between the Union and CMSC, under well-settled Supreme Court precedent, it cannot be disputed that Plaintiffs' state law claims are preempted by

Section 301 of the LMRA. In order to determine what activities the Union and the Company agreed to exclude from paid time, and how many minutes the Union and Company agreed to pay for "hours worked" in donning and doffing activities, the Court will necessarily be required to examine the agreement in the CBA. In other words, to determine whether Plaintiffs are owed any unpaid minimum wages (or overtime available to the extent even available) under the NWHA would require the Court to interpret the 2005 CBA. The case for LMRA 301 preemption is even more compelling with Plaintiffs' NWPCA claims, since those claims are grounded in principles of contract – requiring a "previous agreement" between the parties regarding pay. That "previous agreement" between the parties is a collective bargaining agreement, and therefore the Court would have to interpret the 2005 CBA for purposes of determining what agreement was reached between the parties regarding what activities constitute "hours worked." Therefore, the state law claims are indisputably preempted.

The Eastern District of Pennsylvania reached this very result in *Townsend v. BC Natural Chicken, LLC*, No. 06-4317, 2007 WL 442386 (E.D. Pa. Feb. 2, 2007). In that case, the plaintiffs sought unpaid wages and unpaid overtime wages under federal and state law for time spent donning and doffing PPE. In defense of the claims, the defendant alleged that Section 3(o) of the FLSA precluded recovery under the FLSA because the collective bargaining agreement between the parties provided for twelve minutes pay per week for "wash up time." *Id*. at *4. Relying on the Supreme Court's decision in *Lueck*, the *Townsend* court held that "determining whether Plaintiffs' claim that time spent "donning and doffing" represents hours worked [under the Pennsylvania Minimum Wage Act] is a matter of interpretation of the CBA['s provision on wash up time]." *Id* at *5. The Townsend court also went on to hold that because the Pennsylvania Wage Payment and Collection Law claim "requires reference to the employment

contract," the claim under that statute was also preempted because the collective bargaining agreement provided the source of that cause of action as well. *Id.*

In another case involving CMSC, a federal district court held that if Section 3(o) of the FLSA operated to bar a claim under the FLSA, statutory state law claims for unpaid wages would be preempted by LMRA Section 301 because those claims would require an interpretation of the subject collective bargaining agreement that served to preclude the FLSA claim. *In re Cargill Meat Solutions Corp. Wage & Hour Litig.*, 632 F. Supp. 2d 368, 394–96 (M.D. Pa. 2008). Under that court's analysis, because Section 3(o) indisputably applies here, there can be no question but that Plaintiffs' NWHA and NWPCA claims require interpretation of the 2005 CBA language authorized by Section 3(o). Many other courts have reached similar conclusions regarding state statutory wage claims that require reference to a collective bargaining agreement. *See e.g., Pruell v. Caritas Christi,* No. 09-11722-GAO, 2010 WL 3789283 (D. Mass. Sept. 27, 2010) (plaintiffs state statutory claims for unpaid training, mealtime and preliminary and postliminary "work" preempted by LRMA Section 301); *Murray v. Tyson Foods, Inc.*, No. 08-4001, 2009 WL 322241 (C.D. Ill. Feb. 9, 2009) (dismissing Illinois minimum wage law and wage payment law claims as preempted by Section 301 of the LMRA where resolution of what constituted "work time" required interpretation of collective bargaining agreement); *Anderson v. Industrial Elec. Reels, Inc.*, 812 F. Supp. 999, 1004-05 (D. Neb. 1993) (denying motion to compel arbitration of Nebraska Wage Payment and Collection Act claim where the claimed accrued vacation pay derived from the collective bargaining agreement and was thus preempted by Section 3(o)).[19]

---

[19] *See also Mowry v. United Parcel Serv.,* 415 F.3d 1149, 1157 (10th Cir. 2005) (claim for underpayment of wages under state wage act preempted by Section 301) cert. denied, 129 S. Ct. 1401 (2009); *Wheeler v. Graco Trucking Corp.*, 985 F.2d 108, 112 (3d Cir. 1993) (state law

Here, the collective bargaining agreement between CMSC and the Union expressly provided that employees will not be paid for certain pre- and post-shift clothes changing and washing. Therefore, Section 301 preempts the Nebraska state law claims seeking additional pay for such limited activities because resolution of the state law claims would require the Court to look to the collective bargaining agreement to understand the terms of the parties' agreement. Therefore, summary judgment in CMSC's favor on Plaintiffs' state law claims is warranted for this alternative reason as well.

---

claim for wages due under CBA preempted by Section 301); *Nat'l Metalcrafters Div. of Keystone Consol. Indus. v. McNeil*, 784 F.2d 817 (7th Cir. 1986) (state wage payment law claim for vacation pay due under the terms of a CBA preempted by Section 301); *Zupancich v. U.S. Steel Corp.*, Civil No. 08-5847 ADM/RLE, 2009 WL 1474772 (D. Minn. May 27, 2009) (state wage and hour claim preempted by Section 301); *O'Brien v. Encotech Constr.*, Case No. 00-CV-1133, 2004 WL 609798 (N.D. Ill. March 23, 2004) (state wage payment claim preempted by Section 301); *Nicholas v. St. Agnes Medical Ctr.*, No. Civ. A. 84-5882, 1987 WL 5248 (E.D. Pa. 1987) (claim under state wage payment law for monies due under CBA preempted by Section 301).

## IV. CONCLUSION

Based on the foregoing, CMSC respectfully submits that the Court should grant CMSC's motion for partial summary judgment which effectively disposes of Plaintiff pre- and post-shift donning, doffing and walking time claims in this consolidated action. The Court should also dismiss Plaintiffs' Nebraska state law claims in their entirety and, in addition, grant CMSC such further and additional relief to which it is entitled by law.

Dated:  October 15, 2010                    Respectfully submitted,

                                            s/ Jeremy J. Glenn
                                            Counsel for Defendant

                                            Joseph E. Tilson
                                            Jeremy J. Glenn
                                            Meckler Bulger Tilson Marick & Pearson LLP
                                            123 North Wacker Drive, Suite 1800
                                            Chicago, Illinois  60606
                                            Tel: (312) 474-7900
                                            Fax: (312) 474-7898
                                            joe.tilson@mbtlaw.com
                                            jeremy.glenn@mbtlaw.com

                                            Gail S. Perry
                                            Baylor, Evnen, Curtiss, Grimit & Witt, LLP
                                            Wells Fargo Center
                                            1248 "O" Street, Suite 600
                                            Lincoln, Nebraska 68508
                                            Tel: (402) 475-1075
                                            Fax: (402) 475-9515
                                            gperry@baylorevnen.com

## CERTIFICATE OF SERVICE

I, Jeremy Glenn, hereby certify that on October 15, 2010, I electronically filed the foregoing **Defendant Cargill Meat Solutions Corporation's Brief In Support Of Its Motion For Partial Summary Judgment** with the Clerk of the Court using the CM/ECF System which sent electronic notification of such filing to the following:

Brian P. McCafferty
Kenney & McCafferty Law Firm
3031C Walton Road, Suite 202
Plymouth Meeting, PA 19462

Eric L. Young
Brandon J. Lauria
Egan & Young
526 Township Line Road
Blue Bell, PA 19422

Michael Hamilton
Provost Umphrey Law Firm, LLP
1 Burton Hills Boulevard, Suite 380
Nashville, TN 37215

Roger Doolittle
Doolittle Law Firm
460 Briarwood Drive, Suite 500
Jackson, MS 39206

Philip A. Downey
DOWNEY LAW FIRM
PO Box 736
Unionville, PA 19375

Christopher P. Welsh
WELSH, WELSH LAW FIRM
9290 West Dodge Street, 100 The Mark
Omaha, NE 68114

Carolyn H. Cottrell
Todd M. Schneider
SCHNEIDER, WALLACE LAW FIRM
180 Montgomery Street, Suite 2000
San Francisco, CA 94104

Shanon J. Carson
James A. Wells
Jonathan D. Berger
Russell D. Henkin
BERGER & MONTAGUE , P.C.
1622 Locust Street
Philadelphia, PA 19103

/s/ Jeremy J. Glenn

M:\13443\pleading\MSJ Documents\CMSC Schuyler MSJ Memo Final.doc